## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| **JPMORGAN CHASE BANK, N.A. and** | ) | |
| **J.P. MORGAN SECURITIES INC.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | **Case No.** |
| **v.** | ) | |
| | ) | |
| **JAMES E. CASEY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## COMPLAINT
## (INJUNCTIVE RELIEF SOUGHT)

Plaintiffs JPMorgan Chase Bank, N.A. and J.P. Morgan Securities Inc. (collectively, "JPMorgan" or "the Firm"), file this Complaint and Application for Temporary Restraining Order and Injunctive Relief against Defendant James E. Casey ("Defendant" or "Casey"):

### Preliminary Statement

1.      This action is for a temporary restraining order and a preliminary injunction to maintain the status quo pending resolution of an arbitration proceeding between JPMorgan, Defendant and Defendant's new employer Edward D. Jones & Co., L.P., doing business as Edward Jones ("Edward Jones") that concurrently is being filed with FINRA Dispute Resolution.[1]

---

[1] The Financial Industry Regulatory Authority ("FINRA") was created in July 2007 through the consolidation of the National Association of Securities Dealers, Inc. (the "NASD") and the member regulation, enforcement and arbitration functions of the New York Stock Exchange. JPMorgan has the express right to seek temporary injunctive relief before a court of competent jurisdiction pending the outcome of arbitration before a full panel of duly-appointed arbitrators pursuant to Rule 13804 of the FINRA Code of Arbitration Procedure for Industry Disputes.  A

2.     This dispute arises out of Defendant's departure from JPMorgan on February 3, 2010, and the commencement of his employment on or about February 19, 2010 with his new employer, Edward Jones, a direct competitor of JPMorgan.   Defendant was employed in JPMorgan's Naperville office at the time of his resignation.

3.     In violation of his contractual and common-law duties, Defendant has, after resigning from JPMorgan and joining Edward Jones, improperly solicited numerous JPMorgan clients to move their accounts to Edward Jones, including sending out a mass solicitation letter and calling JPMorgan clients.

4.     In addition, on information and belief, Defendant, prior to leaving JPMorgan, improperly copied or removed JPMorgan's client files and confidential records and took JPMorgan's trade secrets with him.

5.     At the time Defendant left JPMorgan, he serviced approximately 68 of JPMorgan's clients, all but one of whom were existing JPMorgan clients at the time they were assigned to Defendant (the "JPMorgan Accounts").   The JPMorgan Accounts represent approximately $42 million in assets under management, $20 million in deposit balances, and an additional $44 million in trust assets.   Thus, all but one of the JPMorgan Accounts were pre-existing clients who were simply given to Defendant by the Firm to service.   Now, Defendant seeks to improperly solicit and induce such clients to follow him to Edward Jones.

6.     Defendant's conduct constitutes a breach of his Supervision, Confidentiality, and Non-Solicitation Agreement (PCS), dated March 13, 2007 (the "Non-Solicitation Agreement"), JPMorgan's Code of Conduct (which he agreed to abide by), the Terms and Conditions covering JPMorgan's Long Term Incentive Plan stock grants (or

---

true and correct copy of Rule 13804 is annexed to the accompanying declaration of Joseph L. Weidenbach dated March 10, 2010 (the "Weidenbach Decl.").

predecessor plan or plans) ("LTIP"), and a violation of his common-law obligations to JPMorgan.

7.     To prevent continued irreparable harm arising from Defendant's course of misconduct, JPMorgan seeks immediate injunctive relief (in the form of a temporary restraining order and a preliminary injunction) barring Defendant from soliciting JPMorgan's clients, and barring Defendant from further using JPMorgan's confidential and proprietary business and customer information, pending resolution of JPMorgan's claims against Defendant in a related arbitration.

## Jurisdiction and Venue

8.     The Court has jurisdiction in this action pursuant to 28 U.S.C. § 1332(a) in that, as alleged below, plaintiffs JPMorgan, on the one hand, and Defendant, on the other hand, are citizens of different states, and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

9.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(a), in that a substantial part of the events giving rise to the claims occurred in Naperville and/or Wheaton, Illinois.

## The Parties

10.     Plaintiffs are both subsidiaries of JPMorgan Chase & Co., a financial holding company.  Plaintiff JPMorgan Chase Bank, N.A.  ("JPMorgan Chase") is one of the largest banking institutions in the United States, with its principal office located in New York, New York and branch offices across the country.

11.     Plaintiff J.P. Morgan Securities Inc. ("JPMorgan Securities") is a Delaware corporation and a national broker-dealer, with its principal place of business in New

York City, New York.   JPMorgan Securities Inc. is a member firm of FINRA.   Defendant
maintains securities licenses through FINRA.

13. JPMorgan provides traditional banking, investment, and trust and estate
services in the West Chicago metropolitan area through its Private Wealth Management offices
located in Naperville, Wheaton and Deer Park Illinois.

13. Defendant is an individual who at all times relevant herein was employed
and/or conducted business in Naperville, Wheaton and/or Deer Park, Illinois and/or was and is a
citizen of Illinois.   Defendant also is a registered representative currently employed by Edward
Jones in its Naperville office.   Defendant was previously employed by JPMorgan in its
Naperville, Illinois branch office.

14. In connection with his status as a registered representative of JPMorgan,
Defendant executed a Form U-4 Uniform Applications for Securities Industry Registration or
Transfer.  By executing the Form U-4, Defendant agreed to submit to arbitration disputes, claims
and controversies arising between themselves and JPMorgan.

### Factual Allegations

15. On or about March 8, 2007, JPMorgan made an offer of employment to
Defendant.  A true and correct copy of such offer of employment is annexed to the Weidenbach
Decl. as Exhibit B.  On or about March 13, 2007, Defendant entered into the Non-Solicitation
Agreement with JPMorgan.   A true and correct copy of the Non-Solicitation Agreement is
annexed to the Weidenbach Decl. as Exhibit C.   On or about April 2, 2007, Defendant
commenced employment with JPMorgan in its Hinsdale and Deer Park offices.  Defendant was
hired by JPMorgan to be a Market Director.  As a Market Director, Defendant was solely in a
management role and essentially served as the "number two" man to JPMorgan's Market

Manager for the West Chicago Market.  As a Market Director, Defendant's responsibilities included assisting the Market Manager in overseeing the sales activities and helping set the strategic agenda for the market.  Defendant remained in his capacity as a Market Director for approximately one year.

16.    In or about the Spring of 2008, Defendant's role was revised and he became a producing Client Advisor in JPMorgan's Hinsdale office.  Defendant subsequently became a Wealth Manager in or about March 2009.  As both a Client Advisor and a Wealth Manager, Defendant was responsible for generating business from new and existing clients.  In September 2008, the Hinsdale office closed and Defendant moved to JPMorgan's Wheaton office.  On or about October 23, 2009, all Wealth Managers were moved from the Wheaton office, and Defendant moved to JPMorgan's Naperville office, where he remained until his resignation.

17.    A Wealth Manager is the overall relationship manager for JPMorgan clients, all of whom are businesses, foundations, endowments, and high net worth individuals and their families, attending to each client's traditional banking, investment, and trust and estate needs.  As a Wealth Manager, Defendant's job was to focus on providing financial and investment advice and solutions for JPMorgan's traditional banking, investment and trust and estate clients.  His job was to gain a thorough understanding of each client's goals and priorities and to work with a team of JPMorgan specialists to recommend solutions designed to build and preserve the client's wealth by developing a customized, comprehensive investment program.

18.    Defendant did not bring any clients with him to JPMorgan.  All but one of the JPMorgan Accounts serviced by Defendant were existing JPMorgan clients at the time they were assigned to him.  As such, Defendant was responsible for managing approximately 68

JPMorgan clients/households, approximately $42 million in assets under management, $20 million in deposit balances, and an additional $44 million in trust assets.

19.     JPMorgan gave Defendant all but one of the JPMorgan Accounts he was servicing at the time of his resignation; these clients were existing, long-term JPMorgan bank clients or were developed at JPMorgan at the time they were assigned to Defendant.  In fact, the vast majority of the JPMorgan Accounts serviced by Defendant have been clients of JPMorgan or its predecessors for in excess of ten years; indeed, close to 40% of these clients opened their accounts more than 20 years ago, with some over 40 years ago.  Thus, JPMorgan is of the strong opinion that it has a near-permanent relationship with the vast majority of the customers that JPMorgan assigned to Defendant.

20.     JPMorgan has invested substantial time and money, totaling millions of dollars, to acquire, develop and maintain its customers over many years.  It is with great difficultly, and only after a great expenditure of time, money and effort, that JPMorgan was able to acquire its existing clients, and JPMorgan spends substantial resources in gaining knowledge about its clients and protecting the privacy of such information.  It typically takes many years of dealing with clients for JPMorgan to become their primary bank or investing firm.  JPMorgan clients typically remain with and continue to be serviced by the firm, regardless of whether the Wealth Managers resign or leave JPMorgan.  But for JPMorgan having assigned the JPMorgan Accounts to Defendant, he would not have had any contact with any of the clients he is now soliciting.

21.     As part of his official duties at JPMorgan, Defendant had access to extensive confidential financial records and information about JPMorgan's clients, including information about each client's investment and trust and estate needs.  As explained in further

detail below, such information -- which is not publicly available, and cannot be easily duplicated -- is proprietary and valuable, and would be especially useful to a competitor such as Edward Jones.

<b><u>Defendant's Employment Agreements</u></b>

22.     As is noted above, on or about March 13, 2007, Defendant entered into the Non-Solicitation Agreement with JPMorgan.

23.     Section 6 of the Non-Solicitation Agreement, entitled "Special Obligations of Employee," defines Confidential Information related to JPMorgan's business as follows:

> *You understand that by entering into this Agreement and by virtue of your association with JPMC, you hold a position of trust and as a result of that position JPMC will provide you with "Confidential Information" related to JPMC's business. The term "Confidential Information" as used in this Agreement, includes but is not limited to information described as such in the Code of Conduct and (a) information received from third parties under confidential conditions; (b) confidential customer data, including but not limited to customer and prospect names, addresses, phone numbers, financial portfolio, financial account information, financial needs, investment preferences and similar information whether or not in tangible form developed or compiled by JPMC or by you in connection with your employment with JPMC; (c) information concerning established business relationships; (d) non-public information about JPMC's employees; (e) all records and documents concerning the business and affairs of JPMC, including without limitation methods, procedures, devices and other means used by JPMC in the conduct of its business; (f) "trade secrets" as that term is defined by the Uniform Trade Secrets Act (UTSA), which term shall be deemed to include each item of Confidential Information specifically described in this Section 6; and (g) software and other technical, business or financial information, the use of disclosure of which might reasonably be construed to be contrary to the interest of JPMC or its clients. You understand that such Confidential Information will be disclosed to you in confidence and for use only in connection with your employment with JPMC and therefore agree to the following restrictions:*

24.     In Section 6.1 of the Non-Solicitation Agreement, Defendant agreed to return all JPMorgan Confidential Information upon the termination of his employment:

*Upon leaving JPMC's employ for any reason (voluntary or otherwise), or upon JPMC's request at any time, you agree to immediately return to JPMC all Confidential Information in your possession, under your control or which you received or prepared in connection with your employment; and you agree not to retain any copies (whether manually or mechanically produced, including electronic or software versions), summaries, compilations, or excerpts thereof. You also agree to return upon leaving JPMC's employ, or at any time we request, any equipment including but not limited to computers, personal digital assistants, pagers or telephones issued to you for use in your employment, and not to destroy or copy any information contained thereon.*

*You agree (a) to keep Confidential Information confidential at all times during and after your employment with JPMC; (b) for as long as Confidential Information remains confidential, not to disclose or communicate Confidential Information to any third party unless permitted by JPMC policy, required by law, or with JPMC's written consent; and (c) not to use Confidential Information for your own benefit or for the benefit of a third party.*

25.    In Section 6.2 of the Non-Solicitation Agreement, Defendant agreed not to solicit JPMorgan's customers and employees for a period of twelve months after the termination of his employment:

***. . . you agree for a period of twelve (12) months after the termination of your employment, regardless of the circumstances of the termination, not to, directly or indirectly, acting alone or with others, solicit or attempt to solicit, induce to leave or divert or attempt to induce to leave or divert from doing business with JPMC, any JPMC customer with whom you had professional contact, for whom you had responsibility or with respect to whom you were privy to any information during the last two years of your employment with JPMC.***

*This section does not apply to customer relationships you established prior to commencing employment with JPMC, provided that you can substantiate through documents or other suitable evidence that the relationship preceded your commencement of employment with JPMC. You have identified any persons you believe are subject to this exclusion prior to the signing of this Agreement, and any such persons as to whom you have provided suitable documentation are listed in Exhibit "A" attached hereto, which Exhibit shall be initialed and dated by you and your supervisor. The absence of any such Exhibit shall be conclusive evidence that this exclusion does not apply.*

*Nothing in this Agreement prevents you from seeking or accepting employment with any other financial institution, bank, trust company, brokerage firm or other competing entity after your term of employment with JPMC.*

*You also agree, for a period of 12 months after the termination of your employment for any reason, not to directly or indirectly: (1) hire or solicit any current JPMC employee, candidate for employment or former JPMC employee who resigned from JPMC within twelve months of any such solicitation, to apply for or accept employment with any business competing with JPMC, or (2) to otherwise induce any then current JPMC employee or candidate for employment with JPMC to become employed by any business competing with JPMC.* (Emphasis added.)

26.     Although Defendant had prior brokerage firm experience before coming to JPMorgan, his prior position at UBS was in a product support capacity only; therefore, Defendant did not bring any clients with him to JPMorgan from UBS. Moreover, there is no "Exhibit A" to Defendant's Non-Solicitation Agreement in the file, which is consistent with JPMorgan's understanding that he brought no clients with him to JPMorgan.

27.     In addition, in 6.3 of the Non-Solicitation Agreement, Defendant agreed to an injunction in the event that he breached his obligations with respect to returning JPMorgan's confidential information or soliciting JPMorgan's clients or employees:

*By signing below, you agree that any breach, evasion, violation or threatened violation of any term of this Section 6 by you will cause immediate and irreparable injury to JPMC that cannot be adequately remedied by monetary damages and will entitle JPMC to immediate injunctive relief and/or specific performance in any court of competent jurisdiction . . . .*

28.     Additionally, in Section 3 of the Non-Solicitation Agreement, Defendant agreed to adhere to JPMorgan's Code of Conduct, as amended from time to time.

29.     Defendant was provided with JPMorgan's Code of Conduct, which was made available to all employees, as it was updated from time to time. Section 5.11 of JPMorgan's Code of Conduct, dated May 2009, provides:

As a condition of employment with JPMorgan Chase, employees will have certain responsibilities after their employment with JPMorgan Chase terminates. These responsibilities include an obligation to return all firm assets in their possession, maintain the confidentiality of information, refrain from insider trading based on information obtained in the course of employment by JPMorgan Chase, and, if requested, assist JPMorgan Chase with investigations, litigation, and the protection of intellectual property relating to their employment. Senior-Level Employees have additional obligations for one year after they leave JPMorgan Chase, including prohibitions on the solicitation and hiring of JPMorgan Chase employees and solicitation of certain customers. Certain employees are subject to other post-employment restrictions. You are responsible for knowing which post-employment restrictions and requirements apply to you.

30.     A true and correct copy of relevant sections of JPMorgan's Code of Conduct is attached to the Weidenbach Decl. as <u>Exhibit D</u>.

31.     As set forth in Section 1.7 of JPMorgan's Code of Conduct, all JPMorgan employees are required to affirm, either in writing or electronically, that they have read and understood the code and that they will comply with it. Section 1.7 provides:

> *You are required to affirm, either in writing or electronically, that you have read and understood the Code of Conduct and that you will comply with it. This affirmation is required of new employees when they are hired and new directors when they are elected to office. In addition, periodically all employees will be required to re-affirm their understanding of and compliance with the then-current Code.*

Each year, Defendant annually affirmed electronically his agreement to comply with the Code of Conduct. A true and correct copy of Defendant's affirmation to adhere to the Code of Conduct for the year 2009 is annexed to the Weidenbach Decl. as <u>Exhibit E</u>.

32.     Defendant also had additional responsibilities to JPMorgan because he was considered a Senior-Level Employee (as defined in the "Responsibilities of Former Employees") under JPMorgan's Code of Conduct. Defendant's additional responsibilities not to

solicit clients and employees are set forth in Section 1.2 of the "Responsibilities of Former

Employees":

> The firm considers its customer and supplier relationships, as well as its relationships with is employees, officers and contractors, important and valuable assets. Accordingly, as a condition of your employment or continued employment, if you are a Senior-Level Employee (as defined below), then **for a period of one year after your employment with JPMorgan Chase terminates, you may not, directly or indirectly**, on your own behalf or that of any other party, without the prior written consent of the Director of Human Resources of JPMorgan Chase:
>
> - Solicit, induce, or encourage any of the firm's then current employees to leave the firm or to apply for employment elsewhere;
>
> - Hire any employee or former employee who was employed by the firm at the date your employment terminated, unless the individual's employment terminated more than six months before the date of hire or because his or her job was eliminated; or
>
> - Solicit, induce, or encourage to leave the firm, or divert or attempt to divert from doing business with the firm, any then current customers, suppliers, or other persons or entities that were serviced by you or whose names became known to you by virtue of your employment with the firm, or otherwise interfere with the relationship between the firm and such customers, suppliers, and other persons or entities. This does not apply to publicly known institutional customers that you service after your employment with the firm terminates without the use of the firm's confidential or proprietary information. (Emphasis added.)

A true and correct copy of the related policy link "Responsibilities of Former Employees", which

expands upon Section 5.11 of JPMorgan's Code of Conduct, is attached to the Weidenbach Decl.

as Exhibit F.   In addition, Defendant's affirmation to the Code of Conduct expressly indicates

that he acknowledges that he is a Senior-Level Employee and is bound by these additional post-

employment responsibilities and obligations.   See Exhibit E to the Weidenbach Decl.

33.    JPMorgan's intranet also made available to all of JPMorgan's employees a policy link related to Section 5.11 of JPMorgan's Code of Conduct, entitled "Responsibilities of Former Employees", which provides in relevant part:

> When you leave the employ of JPMorgan Chase, you must turn over to the firm all assets of the firm that are in your possession or control, such as:
>
> *        *        *
>
> - All confidential or proprietary information related to the firm's business, employees, customers, partners, counterparties, or suppliers, and all copies thereof, whether maintained electronically or otherwise, including information on mobile or remote computers, such as desktop PCs, laptops. Personal digital assistants, pagers, cell phones and all other wireless devices, whether you own the devices or the devices belong to the firm and are used at locations other than a JPMorgan Chase place of business.
>
> You may not duplicate or remove from JPMorgan Chase's premises, or directly or indirectly use or disclose to anyone, any confidential or proprietary information.   (For a description and additional examples of confidential and proprietary information, see the firm's Code of Conduct.)

34.    In addition, Defendant agreed to similar restrictions that were contained in the Terms and Conditions covering JPMorgan's LTIP, which he exercised and participated in.  In addition to containing a provision preventing the disclosure of JPMorgan confidential information, the Terms and Conditions of the LTIP include provisions preventing the solicitation of JPMorgan customers and JPMorgan employees for a period of one year following the termination of Defendant's employment with JPMorgan.  A true and accurate copy of the Terms and Conditions covering JPMorgan's LTIP is annexed to the Weidenbach Decl. as Exhibit G.

35.    In consideration for entering into an employment relationship with JPMorgan and executing the Non-Solicitation Agreement, Defendant was provided with significant benefits, including substantial compensation, office and support facilities, securities

registration, insurance licensing, underwriting, research, brokerage operations and health insurance.

### JPMorgan's Confidential Information

36.    During the course of his employment by JPMorgan, Defendant had access to highly confidential JPMorgan client and customer files in addition to other financial and trust and estate information that is confidential and proprietary to JPMorgan.  JPMorgan's client and customer files contain confidential financial information regarding each client, including client identity, address, telephone numbers, transactional history, tax information, personal financial data, banking information and investment objectives, among other confidential and proprietary data.  Defendant had no interaction with any of the clients he serviced at JPMorgan (and no knowledge of any of their confidential information) until he started working at JPMorgan.  As indicated above, this information has been collected at great expense to the firm, is not easily duplicated, and would be extremely valuable to a competitor.

37.    A critical factor to JPMorgan's continued success is its relations with its customers and financial consultants.  JPMorgan has built the loyalty of its customer base through many years of effort and has invested substantially in building JPMorgan's goodwill.  JPMorgan spends substantial resources in terms of time, effort and money annually to provide programs and support to its Private Wealth Management employees, including Defendant, for them to use to obtain and build relationships with its customers.

38.    JPMorgan's records maintained concerning its customers are not available from other sources and have been created and updated for a period of many years based on JPMorgan's relationship with its clients.  JPMorgan has invested substantial corporate resources to develop and maintain its customer information.  Each and every JPMorgan customer that

Defendant serviced was developed by JPMorgan at great expense and over a number of years. JPMorgan's customer list is the lifeblood of its business and the expenditures incurred by JPMorgan in obtaining its clients include the millions of dollars spent by JPMorgan every year on national and local advertising and marketing, the millions of dollars it costs to train JPMorgan's employees, and the many other expenditures JPMorgan incurs in maintaining its goodwill in the industry.

39.     JPMorgan has also expended significant resources to service its customers, all but one of which were assigned to Defendant.  These resources include millions of dollars a year JPMorgan spends for sales support staff, clearing services, operations personnel, systems and support, management and compliance supervision, salaries, annual registration fees, computer services and equipment, phone, mail, research, literature, seminars, trade and other professional news publications, promotional events, securities research and analysis, and other services.  JPMorgan has borne the entire expense of these services and activities as well, with no financial contribution from Defendant.

40.     The trade secret information that Defendant, on information and belief, has misappropriated was entrusted to JPMorgan by its customers with the expectation that it would remain confidential and would not be disclosed to third parties.  Indeed, by law JPMorgan must safeguard this information until such time as the controlling authorities authorize its release.  Defendant had access to this information solely by virtue of his employment by JPMorgan.  JPMorgan, and Defendant, is obliged to maintain the confidentiality of this information.  For its part, JPMorgan took numerous steps to protect the confidentiality of this information.  Defendant was fully aware of, and responsible for, complying with JPMorgan's internal policies regarding confidentiality.  JPMorgan has implemented numerous other policies,

and has established tight security, to ensure the confidentiality of its customer information.  For example, access to the JPMorgan's computer network by registered representatives is password-protected.  JPMorgan also limits its customer information to certain employees and management who need access to such information.

41.     Employees such as Defendant must maintain customer information as strictly confidential.  These instructions are confirmed in the various agreements and policy manual provisions referenced above and, until Defendant's resignation, these policies were strictly observed.

### Defendant's Misconduct

42.     Defendant resigned from JPMorgan on February 3, 2010 and commenced employment with Edward Jones on or about February 19, 2010.  Upon joining Edward Jones, Defendant has begun the solicitation of JPMorgan's customers in violation of his obligations to JPMorgan.  Our investigation is ongoing, but we already have learned that Defendant has embarked upon a mass mailing and calling campaign to persuade JPMorgan's customers to transfer their accounts from JPMorgan to Edward Jones.

43.     Before leaving JPMorgan, on information and belief, Defendant misappropriated JPMorgan's confidential customer and client information, including home addresses and telephone numbers.  Without such information, it would not have been possible for Defendant to send a mass mailing and to commence calling JPMorgan's clients.  Accordingly, JPMorgan believes that Defendant must have used a JPMorgan client list to send his mass mailing and to start soliciting JPMorgan clients.

44.     During the course of his employment with JPMorgan, Defendant was often provided with client lists, such as market segmentation lists, that gave updates on the client

accounts and contained confidential client information, including account name, number and assets. Defendant would be provided with a hard copy of such lists every few weeks for use in servicing his assigned clients and developing new business from these clients. JPMorgan employees have searched Defendant's office and work space, as well as the files for the JPMorgan clients serviced by Defendant, but have been unable to locate any of these lists that were given to Defendant in the course of his employment with JPMorgan.

45.     Since Defendant commenced employment with Edward Jones, JPMorgan employees have spoken to many of the JPMorgan Accounts serviced by Defendant, many of whom have informed us that they received a letter from Defendant soliciting their business. A true and correct copy of a sample mass mailing letter, dated February 26, 2010, sent by Defendant to JPMorgan clients shortly after he joined Edward Jones is annexed to the Weidenbach Decl. as Exhibit H. In addition, numerous JPMorgan Accounts have informed the Firm that Defendant called them within the past two weeks in order to solicit them to transfer their business to Edward Jones. Such conduct is in violation of Defendant's contractual duties under the Non-Solicitation Agreement, the JPMorgan Code of Conduct and the Terms and Conditions of the LTIP, as well as his common-law obligations to JPMorgan.

46.     In addition to soliciting JPMorgan clients, Defendant has also improperly solicited a JPMorgan employee to terminate his/her employment with JPMorgan. In November 2009, Defendant solicited a JPMorgan Wealth Manager Associate to join him at his new employer when he left JPMorgan. Specifically, during a conversation with the JPMorgan employee, Defendant indicated that he was exploring potential job opportunities and was considering opening up his "own shop at Edward Jones" and that this employee should join him when he left. While Defendant was free to explore his employment opportunities, he was not

free to solicit JPMorgan employees to join him at a competitor. As is indicated above, during the term of his employment and for a period of 12 months thereafter, Defendant is prohibited from soliciting JPMorgan employees to terminate their employment with JPMorgan and join a competitor. Defendant has violated these provisions.

47.     Unless Defendant's misconduct is immediately restrained and enjoined, other competitors of JPMorgan will be encouraged to engage in the same kind of improper behavior with complete impunity, the result of which will inflict severe and permanent damages on JPMorgan.

48.     Defendant's misconduct, as described above, constitutes at a minimum, breach of contract, breach of fiduciary duty and duty of loyalty, misappropriation of trade secrets, tortious interference, conversion, and unfair competition. Unless Defendant's conduct is immediately enjoined, JPMorgan's other employees will be encouraged to engage in the same reprehensible conduct. This misconduct is highly disruptive to JPMorgan's ability to conduct business in a stable manner and to maintain JPMorgan's goodwill with its customers and employees.

49.     By seeking to pirate away JPMorgan's clients, Defendant has caused and will continue to cause continuing and irreparable injury to JPMorgan which cannot be cured by monetary damages. Defendant's wrongdoing has caused and will continue to inflict irreparable harm to JPMorgan by causing:

> (a) Use and disclosure of JPMorgan's trade secrets and confidential and proprietary information, including customer lists;
>
> (b) Loss of JPMorgan clients, and loss of customer confidence;
>
> (c) Injury to JPMorgan's reputation and goodwill in the West Chicago area;

(d)  Damage to office morale and stability, and the undermining of office protocols and procedures; and

(e)  Present economic loss, which is unascertainable at this time, and future economic loss, which is now incalculable.

## FIRST CAUSE OF ACTION
### (Breach of Contract)

50.    JPMorgan realleges and incorporates herein by reference the allegations of paragraphs 1 through 49 hereof.

51.    Defendant breached his contract with JPMorgan by soliciting JPMorgan's clients through the use of JPMorgan's confidential documents and information.   By pirating away JPMorgan's clients and proprietary and confidential information, Defendant seeks to convert to his benefit JPMorgan's protectable interests.

52.    As a direct and proximate result of Defendant's breach of his contract, JPMorgan has sustained and will continue to sustain irreparable injury, the damages from which cannot now be calculated.   Accordingly, JPMorgan is entitled to a temporary restraining order and a preliminary injunction.

## SECOND CAUSE OF ACTION
### (Misappropriation of Trade Secrets)

53.    JPMorgan realleges and incorporates herein by reference the allegations of paragraphs 1 through 52 hereof.

54.    JPMorgan's confidential and proprietary business and customer information derives substantial, independent economic value from not being generally known to the public or to JPMorgan's competitors, who could obtain economic value from the information.   JPMorgan expended substantial financial and human resources to develop this information, which cannot be easily acquired or replicated by others, from among the literally

millions of actual or potential individual investors in the marketplace.  Further, JPMorgan has taken substantial efforts to maintain the secrecy of its confidential and proprietary business and customer information, including but not limited to restricting access to such information, designating such information as confidential, and requiring confidentiality agreements. Accordingly, JPMorgan's confidential and proprietary business and customer information constitutes trade secrets pursuant to statutory and common law.

55.     As a direct and proximate result of Defendant's misappropriation of JPMorgan's trade secrets, JPMorgan has sustained and will continue to sustain irreparable injury, the damages from which cannot now be calculated.  Accordingly, JPMorgan is entitled to a temporary restraining order and a preliminary injunction.

### THIRD CAUSE OF ACTION
**(Breach of Fiduciary Duty)**

56.     JPMorgan realleges and reincorporates herein by reference the allegations contained in paragraphs 1 through 55 hereof.

57.     As an employee of JPMorgan, Defendant owed JPMorgan a fiduciary duty of trust and loyalty.

58.     Defendant's fiduciary duties required him at all times to, among other things, act in JPMorgan's best interests and maintain the confidentiality of JPMorgan's trade secrets and other confidential and proprietary business and customer information.  Defendant's fiduciary duties required him at all times to refrain from, among other things, soliciting JPMorgan's clients and attempting to solicit or soliciting JPMorgan's employees to join him at a competing company.

59.    Defendant breached his fiduciary duties to JPMorgan by engaging in the conduct alleged above.  Defendant engaged in such wrongdoing prior to the time he resigned from JPMorgan and after he joined JPMorgan's direct competitor, Edward Jones.

60.    As a direct and proximate result of Defendant's breach of fiduciary duty, JPMorgan has sustained and will continue to sustain irreparable injury, the damages from which cannot now be calculated.  Accordingly, JPMorgan is entitled to a temporary restraining order and a preliminary injunction.

### FOURTH CAUSE OF ACTION
### (Breach of Duty of Loyalty)

61.    JPMorgan realleges and incorporates herein by reference the allegations of paragraphs 1 through 60 hereof.

62.    By virtue of his position with JPMorgan, Defendant owed JPMorgan a duty of undivided loyalty during the term of his employment with JPMorgan.  Defendant's duty of loyalty prohibited him from competing with JPMorgan or assisting a competing business during the course of his employment with JPMorgan.  Defendant's duty of loyalty also included a duty to act toward JPMorgan fairly, honestly and in good faith, to maintain the confidentiality of JPMorgan's trade secrets and other confidential and proprietary business and customer information, and to refrain from any act or omission calculated or likely to injure JPMorgan.

63.    Defendant breached his duty of loyalty to JPMorgan by engaging in the conduct alleged above (and incorporated herein) prior to the termination of his employment with JPMorgan.

64.    Defendant knew and intended, or knew and recklessly or negligently disregarded, that his acts had the purpose and/or effect of disrupting and harming JPMorgan's business.

65.     As a direct and proximate result of Defendant's breach of his duty of loyalty, JPMorgan has sustained and will continue to sustain irreparable injury, the damages from which cannot now be calculated.    Accordingly, JPMorgan is entitled to a temporary restraining order and a preliminary injunction.

### FIFTH CAUSE OF ACTION
**(Intentional Interference with Actual
and Prospective Economic Advantages)**

66.     JPMorgan realleges and incorporates herein by reference the allegations of paragraphs 1 through 65 hereof.

67.     JPMorgan has developed and maintains advantageous actual and prospective business relationships with its employees and clients that promise a continuing probability of future economic benefit to JPMorgan.

68.     JPMorgan is informed and believes, and on that basis alleges, that Defendant knew or reasonably should have known about JPMorgan's advantageous actual and prospective business relationships with its employees and clients.

69.     JPMorgan is informed and believes, and on that basis alleges, that Defendant has intentionally, maliciously and improperly interfered with and continues to interfere with JPMorgan's relationships with its clients by, among other things, directly and/or indirectly attempting to induce JPMorgan clients to sever their relationships with JPMorgan and to induce them to do business with Edward Jones.

70.     There was no privilege and justification for Defendant's conduct. Moreover, Defendant's actions also constitute wrongful conduct above and beyond the act of interference itself, including misappropriation of trade secrets, breach of contract, unfair competition, breach of his fiduciary duty, and breach of his duty of loyalty.

71.     Defendant's conduct was willful and malicious.

72.     As a direct and proximate result of Defendant's tortious interference with actual and prospective business relationships, JPMorgan has sustained and will continue to sustain irreparable injury, the damages from which cannot now be calculated.   Accordingly, JPMorgan is entitled to a temporary restraining order and a preliminary injunction.

**SIXTH CAUSE OF ACTION**
**(Negligent Interference with Actual and**
**Prospective Economic Advantages)**

73.     JPMorgan realleges and incorporates herein by reference the allegations of paragraphs 1 through 72 hereof.

74.     JPMorgan entrusted Defendant with confidential information for use solely in performing his duties as an employee of JPMorgan.   As an employee of JPMorgan, Defendant occupied a position of great trust and confidence.     Defendant thereby owed JPMorgan a fiduciary duty to deal with JPMorgan in good faith and with loyalty.   Defendant was also obligated to use due care so as not to interfere with JPMorgan's business relationships, including those with its employees and clients.

75.     Defendant, in breach of his duty of due care, has attempted to induce JPMorgan clients and employees to leave JPMorgan.

76.     JPMorgan is informed and believes, and on that basis alleges, that Defendant was fully aware that his failure to use ordinary care could subject JPMorgan to lose clients and employees.

77.     As a direct and proximate result of the Defendant's negligent interference with actual and prospective business relationships, JPMorgan has sustained and will continue to

sustain irreparable injury, the damages from which cannot now be calculated.   Accordingly, JPMorgan is entitled to a temporary restraining order and a preliminary injunction.

**SEVENTH CAUSE OF ACTION**
**(Conversion)**

78.     JPMorgan realleges and incorporates herein by reference, the allegations of paragraphs 1 through 77 hereof.

79.     At all times, JPMorgan was, and still is, entitled to the immediate and exclusive possession of its trade secrets and other proprietary information, and all physical embodiments thereof, as alleged above.

80.     JPMorgan is informed and believes that Defendant took JPMorgan's trade secret and other proprietary information, including but not limited confidential client information, and converted them for the use of Defendant and those acting in concert with him.

81.     The continued detention of JPMorgan's personal property by Defendant constitutes conversion.

82.     As a direct and proximate result of Defendant's conversion, JPMorgan has sustained and will continue to sustain irreparable injury, the damages from which cannot now be calculated.   Accordingly, JPMorgan is entitled to a temporary restraining order and a preliminary injunction.

**EIGHTH CAUSE OF ACTION**
**(Unfair Competition)**

83.     JPMorgan realleges and incorporates herein by reference the allegations of paragraphs 1 through 82 hereof.

84.     Defendant's conduct as set forth above and incorporated herein is unlawful, unfair, fraudulent and deceptive, and constitutes unfair competition.

85.    As a direct and proximate result of the Defendant's unfair competition, JPMorgan has sustained and will continue to sustain irreparable injury, the damages from which cannot now be calculated.  Accordingly, JPMorgan is entitled to a temporary restraining order and a preliminary injunction.

WHEREFORE, JPMorgan respectfully requests that a judgment be entered in its favor against Defendant as follows:

A.    In support of all claims for relief, a temporary and preliminary injunction lasting until such time as FINRA Dispute Resolution renders an award in the underlying dispute, enjoining and restraining Defendant, directly or indirectly, and whether alone or in concert with others, including any director, officer, agent, employee and/or representative of Edward Jones, from:

> (a) soliciting, attempting to solicit, inducing to leave or attempting to induce to leave any JPMorgan customer serviced by Defendant at JPMorgan or with respect to whom Defendant was privy to confidential information during the last two years of his employment with JPMorgan; and
>
> (b) using, disclosing or transmitting for any purpose JPMorgan's documents, materials and/or confidential and proprietary information pertaining to JPMorgan, JPMorgan's employees, and/or JPMorgan's clients.

B.    Ordering Defendant, and all those acting in concert with him, including but not limited to the directors, officers, employees and agents of Edward Jones, to return to JPMorgan or its counsel all records, documents and/or information in whatever form (whether original, copied, computerized or handwritten), pertaining to JPMorgan's customers, employees and business, within 24 hours of notice to Defendant or his counsel of the terms of such an order.

C.    Such other and further relief as the Court deems just and proper.

Dated:  March __, 2010

Respectfully submitted,

JPMORGAN CHASE BANK, N.A. and
J.P. MORGAN SECURITIES INC.


By:    /s/*Chad W. Main*_____
          One of Their Attorneys

Chad W. Main
Anna Wermuth
Rachel S. Urquhart
Meckler Bulger Tilson Marick & Pearson LLP
123 N. Wacker Drive, Suite 1800
Chicago, IL 60606
Tel.:  312-474-7900
Fax:  312-474-7898

Leonard Weintraub (pro hac vice to be applied for)
Paduano & Weintraub LLP
1251 Avenue of the Americas, Ninth Floor
New York, NY 10020
Tel.:  212-785-9100
Fax:  212-785-9099

N:\shared\urquhartR\nEW\JPMorgan-Complaint.doc